## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
**www.flsb.uscourts.gov**

*In re*                                                      Case No.:  16-17186-BKC-LMI

PCH COMMUNICATIONS, LLC,                     Chapter 7

_____Debtor._____/

JACQUELINE CALDERIN, Chapter 7 Trustee,     Adv. Case No.:  _____-_____

      Plaintiff,

vs.

113 BOERUM PL, LLC, a New York
limited liability company,

_____Defendant._____/

### COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFER

    Jacqueline Calderin, as Chapter 7 Trustee (the "Trustee" or "Plaintiff") of the bankruptcy estate of PCH Communications, LLC ("PCH" or the "Debtor"), by and through undersigned counsel, files this complaint (the "Complaint") to avoid and recover a fraudulent transfer, pursuant to sections 544, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), against 113 Boerum PL, LLC (the "Defendant"), a New York limited liability company, and alleges as follows:

### NATURE OF THE ACTION, PARTIES, JURISDICTION AND VENUE

    1.    This adversary proceeding relates to the Debtor's main bankruptcy case styled *In re PCH Communications, LLC*, Case No. 16-17186-BKC-LMI (the "Main Case"), pending before the United States Bankruptcy Court for the Southern District of Florida, Miami Division.



2.      Plaintiff is the duly appointed Chapter 7 Trustee of the Debtor's bankruptcy estate.

3.      Defendant is a New York limited liability company with its principal place of business in New York.

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157(b) and 1334(b) and Bankruptcy Rule 7004.

5.      This is a core proceeding for which the Court is authorized to determine all matters pursuant to 28 U.S.C. § 157(b)(2)(A) and (H).

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

### A. The Bankruptcy Case

7.      On May 19, 2016 (the "Petition Date"), Wide Angle Productions Group, Inc., Falcon Enterprises, Inc., and Rethink Post, LLC, filed an Involuntary Petition against the Debtor under Chapter 7 of the Bankruptcy Code, initiating the Main Case [Main Case ECF #1].

8.      On June 14, 2016, the Debtor filed its *Consent to Involuntary Petition* [Main Case ECF #9], and the Court entered the *Order for Relief Under Chapter 7 of the Bankruptcy Code* [Main Case ECF #10].

9.      On June 24, 2016, Plaintiff was appointed Chapter 7 Trustee of the Debtor's bankruptcy estate [Main Case ECF #12].

### B. PCH's Formation

10.     The formation of PCH was effectively a merger of several closely held advertising and public relations firms in various locations around the country, including Florida,

2



Illinois, New York, Texas, California, and Georgia. As conceived by its founders, PCH's formation was a roll-up of various minority-owned advertising firms with the goal of becoming the largest multicultural, minority-owned advertising agency in the United States.

11. In connection with the formation of PCH, on or around October 7, 2014, PCH purchased the assets and liabilities of the following agencies (the "Transaction"): (1) Wright-Islam Holdings, LLC d/b/a Commonground ("Commonground"), a Delaware limited liability company with its principal place of business in Chicago, Illinois; (2) MGSCOMM, LLC ("MGS"), a Florida limited liability company; and (3) Cunningham Group, Inc., a Florida corporation ("Cunningham Group," and collectively with Commonground and MGS, the "Predecessor Entities"), through the execution of various "Contribution Agreements" with the Predecessor Entities and their respective owners.

12. Although PCH was touted as a "merger" of the Predecessor Entities, the Transaction was in substance a leveraged buyout by PCH of the assets of the Predecessor Entities.

13. The Transaction was funded with $16.65 million (the "Funding"), comprised of: (1) a $12 million loan to PCH from Fifth Third Bank secured by substantially all the assets of PCH and (2) an equity investment by Panton Equity Partners, LLC and certain of its affiliates in the aggregate amount of $4.65 million. In addition, Commonground received a $5 million note payable from PCH.

14. Thus, the Transaction added approximately $17 million of debt to PCH's books at its inception, in addition to the existing trade debt that PCH assumed from the Predecessor Entities.

Agentis
Legal Advocates & Advisors

501 Brickell Key Drive · Suite 300 · Miami, Florida 33131 · T. 305.722.2002 · www.agentislaw.com

15.     At the closing of the Transaction, substantially all of the Funding was disbursed to the Predecessor Entities, and subsequently to their respective equity holders, and used to pay various transactional fees and expenses.

16.     As a result, PCH was left severely undercapitalized and with minimal cash from which to operate despite taking on approximately $17 million of new debt to fund the Transaction. PCH was so undercapitalized that it was likely in default of certain financial covenants under its credit agreement with Fifth Third Bank within weeks of closing the Transaction, if not immediately after closing.

17.     PCH's ability to service the debt incurred to fund the Transaction was based on unreasonable growth assumptions. PCH did not and could not achieve or sustain the level of cash flow necessary to service its substantial debt obligations created by the Transaction while also providing bargained-for services to clients.

18.     From the moment the Transaction closed, PCH was left with unreasonably small capital to operate, was insolvent on a balance-sheet basis, and thereafter never achieved financial viability.

**C. The Lease and Transfer**

19.     Approximately five months after the Transaction and the formation of PCH, on or around March 4, 2015, Sherman Wright ("Wright"), an executive of PCH, and his wife, Kara Wright (together with Wright, the "Wrights"), executed a certain lease agreement (the "Lease") with the Defendant, 113 Boerum PL, LLC, as landlord, through which the Wrights leased a four story luxury townhouse located at 113 Boerum Place, Brooklyn, New York 11201 (the "Apartment," as defined by the Lease) for a two-year term, commencing on June 1, 2015 and

4

ending on May 31, 2017. True and correct copies of the Lease and the riders relating thereto (the "Lease Riders"), executed by the Wrights, are attached hereto as **Exhibit "A."**

20.       According to the Lease, "[t]he Apartment must be used only as a private Apartment to live in as the primary residence of the Tenant[s] and for no other reason." Lease ¶ 1; *see also* Lease Riders ¶ 8 ("[n]o other person other than Sherman & Kara Wright and their respective families shall occupy the Premises, and the Premises shall be used only as a private dwelling and for no other purpose.").

21.       Under the Lease, the Wrights were obligated to pay the Defendant monthly rent of $22,000.00 during the first year of the Lease term, and $23,000.00 during the second year of the Lease term. *See* Lease Riders ¶ 17. Upon execution of the Lease, the Wrights were required to pay the Defendant a total amount of $68,500.00, consisting of (i) a security deposit in the amount of $22,000.00, (ii) first month's rent of $22,000.00, (iii) last month's rent of $23,000.00, (iv) a pet security fee in the amount of $1,000.00, and (iv) an exit cleaning fee in the amount of $500.00 (collectively, the "Initial Lease Obligations"). *Id.*

22.       On or around March 9, 2015, at a time when the Debtor had unreasonably small capital to operate, and was balance-sheet insolvent with little hope of achieving financial viability to meet its substantial debt obligations, the Debtor made a payment to the Defendant in the amount of $68,500.00 (the "Transfer"). A copy of the check evidencing the Transfer is attached hereto as **Exhibit "B"**.

23.       Upon information and belief, the Debtor made the Transfer to satisfy the Wrights' personal Initial Lease Obligations to the Defendant.

Agentis
*Legal Advocates & Advisors*

**501 Brickell Key Drive · Suite 300 · Miami, Florida 33131 · T. 305.722.2002 · www.agentislaw.com**

24.     Upon information and belief, the Debtor was not a party to or a guarantor under the Lease, and was not obligated to make any payments to the Defendant under the Lease.

25.     Upon information and belief, the Debtor did not owe a debt to the Defendant. Upon information and belief, the Defendant did not provide any services or lease any premises to the Debtor for which payment from the Debtor would have been required, and any amounts owed to the Defendant for which the Transfer was made were the Wright's personal obligations relating to their private residence and wholly unrelated to the Debtor's business.

26.     Accordingly, the Debtor received no value in exchange for making the Transfer to the Defendant.

**COUNT I:**
**AVOIDANCE OF FRAUDULENT TRANSFER**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**

27.     The Plaintiff realleges the allegations set forth in paragraphs 1 through 26 as if fully restated herein.

28.     Section 548(a)(1) of the Bankruptcy Code provides that:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> . . .
>
> > (B)(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > > (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> > >
> > > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

6



> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

29.    The Debtor made the Transfer to the Defendant within the two-year period preceding the Petition Date.

30.    At the time of the Transfer, Wright was either a director, officer, or person in control of the Debtor, and was therefore an "insider" of the Debtor under section 101(31) of the Bankruptcy Code.  At the time of the Transfer, Kara Wright was the relative of Wright, and was therefore also an insider of Debtor under section 101(31) of the Bankruptcy Code.

31.    The Debtor did not receive any value from the Defendant in exchange for the Transfer.  Because the Debtor was not obligated under the Lease, and the Apartment was to be used solely by the Wrights as their private, personal residence, the obligations for which the Transfer was made were unrelated to the Debtor or the Debtor's business and were personal expenses of the Wrights.

32.    The Transfer was made at a time where the Debtor was severely undercapitalized and unable to service its substantial debt obligations while also providing bargained-for services to its clients.  Accordingly, at the time the Debtor made the Transfer, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

Agentis
Legal Advocates & Advisors

501 Brickell Key Drive · Suite 300 · Miami, Florida 33131 · T. 305.722.2002 · www.agentislaw.com

33.    The Debtor was insolvent at the time of the Transfer or became insolvent as a result of the Transfer.

34.    At the time the Debtor made the Transfer, the Debtor intended to incur, or believed that it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

35.    To the extent that the Debtor made the Transfer pursuant to an employment contract with Wright, such Transfer was made for the benefit of an insider of the Debtor, and was not made in the ordinary course of business.

36.    Accordingly, the Trustee may avoid the Transfer under 11 U.S.C. § 548(a)(l)(B).

**WHEREFORE** the Plaintiff, Jacqueline Calderin, respectfully requests that this Court enter judgment in her favor and against Defendant:

A.    declaring the Transfer to be a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B);

B.    avoiding the Transfer as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B) of the Bankruptcy Code; and

C.    granting such other and further relief as may be just and equitable.

**COUNT II:**
**AVOIDANCE OF FRAUDULENT TRANSFER**
**PURSUANT TO 11 U.S.C § 544 AND FLA. STAT. § 726.105(1)(B)**

37.    The Trustee realleges the allegations in paragraphs 1 through 26 as if fully restated herein.

38.    Claims of the Debtor's creditors arose prior to and after the Transfer was made by the Debtor to the Defendant.

**agentis**
Legal Advocates & Advisors

**501 Brickell Key Drive · Suite 300 · Miami, Florida 33131 · T. 305.722.2002 · www.agentislaw.com**

39.    On the Petition Date, these creditor claims remained in existence, and were outstanding and unpaid.

40.    The Trustee, as trustee of the Debtor, has, as of the Petition Date, and without regard to any knowledge of the Trustee or a creditor of the Debtor, the rights and powers of:

> (1)    a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; [or]
>
> (2)    a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists . . . .

*See* 11 U.S.C. § 544(a).

41.    Further, section 544(b) of the Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by the creditor holding an unsecured claim that is allowable under section 502 of this title . . . ." *Id.* at § 544(b).

42.    Accordingly, 11 U.S.C. § 544 grants the Trustee the powers of a hypothetical, most favored lien and execution creditor or unsecured creditor of the Debtor as of the Petition Date.

43.    As a hypothetical, most favored lien and execution creditor or unsecured creditor of the Debtor, the Trustee has the right to assert claims under applicable law, including, *inter alia*, Florida Statute § 726.105(1)(b), which provides, in pertinent part, that:

> (1) [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose

9



before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (1) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (2) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1)(b).

44.     The Debtor received no equivalent value, reasonable or otherwise, in exchange for the Transfer. Because the Debtor was not obligated under the Lease, and the Apartment was to be used solely by the Wrights as their private, personal residence, the obligations for which the Transfer was made were unrelated to the Debtor or the Debtor's business and were personal expenses of the Wrights.

45.     On the date of the Transfer, the Debtor was engaged or about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction. The Transfer was made at a time where the Debtor was severely undercapitalized and unable to service its substantial debt obligations while also providing bargained-for services to its clients.

46.     At the time of the Transfer, the Debtor intended to incur, or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

10

47.     Accordingly, the Trustee is entitled to avoid and recover the Transfer pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b).

**WHEREFORE**, the Plaintiff, Jacqueline Calderin, respectfully requests that the Court enter a judgment in her favor and against the Defendant:

A.     declaring the Transfer to be a fraudulent transfer pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b);

B.     avoiding the Transfer as a fraudulent transfer pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b); and

C.     Granting such other and further relief as may be just and equitable.

**COUNT III:**
**RECOVERY OF AVOIDED TRANSFER**
**PURSUANT TO 11 U.S.C. § 550**

48.     The Plaintiff realleges the allegations set forth in paragraphs 1 through 26 as if fully restated herein.

49.     For the reasons set forth in Counts I and II above, the Transfer is avoidable pursuant to sections 544 and 548 of the Bankruptcy Code.

50.     Section 550(a) of the Bankruptcy Code provides, in relevant part, that:

[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

11



51.     By virtue of its receipt of Debtor funds, the Defendant was the initial transferee of the Transfer, or alternatively, an immediate or mediate transferee of any initial transferee of the Transfer.

52.     Accordingly, the Transfer, or the value of the Transfer, is recoverable by the Plaintiff for the benefit of the Debtor's bankruptcy estate pursuant to section 550 of the Bankruptcy Code.

**WHEREFORE** the Plaintiff, Jacqueline Calderin, respectfully requests that the Court enter a judgment in her favor and against the Defendant:

A.      finding the Defendant to be the initial transferee of the Transfer, or alternatively, an immediate or mediate transferee of any initial transferee of the Transfer under 11 U.S.C. § 550(a);

B.      directing the Defendant to turn over to the Trustee the value of the Transfer, plus pre- and post-judgment interest and the Trustee's reasonable attorneys' fees and costs; and

C.      granting such other and further relief as may be equitable and just.

Dated: June 5, 2018

    *I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am qualified  to practice in this Court as  set forth in Local Rule 2090-1(A).*

                **AGENTIS PLLC**
                *Counsel for Plaintiff, Chapter 7 Trustee*
                501 Brickell Key Drive, Suite 300
                Miami, Florida 33131
                T. 305.722.2002

                By:  _____

                    Nicole G. Helmstetter
                    Florida Bar No.: 86937
                    ngh@agentislaw.com
                    Tamara Van Heel
                    Florida Bar No. 107104
                    tvh@agentislaw.com

12



**Exhibit "A"**
**Lease**



A 58—Apartment lease, comprehensive form, rules, promisary, plain English format, 11-93    PREPARED BY ARNOLD MANDELL, L.L.B.    © 1994 BY BlumbergExcelsior, Inc. PUBLISHER NYC 10013

# LEASE AGREEMENT

The Landlord and Tenant agree to lease the Apartment for the Term and at the Rent stated on these terms:

**LANDLORD:**
113 BOERUM PL LLC
Address for Notices 100A Broadway, #440
Brooklyn, New York 11249
Apartment (and terrace, if any) House ..... at 113 Boerum Place, Brooklyn, New York 11201
Bank ...........................

**TENANT:**
SHERMAN WRIGHT and KARA WRIGHT
4333 N. Tripp
Chicago, IL 60841

| Lease date: February ..... 2015 ..... | Term Two (2) Years ........... beginning June 1, 2015 ..... ending May 31, 2017 ..... | Yearly Rent $264,000.00** Monthly Rent $22,000.00** Security $22,000.00** |
| Broker* The Corcoran Group | ** See Par. 17 of Rider for Details Concerning Year Two Rent Increase | |

Rider  Additional terms on __8__ page(s) initialed at the end by the parties is attached and made a part of this Lease.

**1. Use** The Apartment must be used only as a private Apartment to live in as the primary residence of the Tenant and for no other reason. Only a party signing this Lease may use the Apartment. This is subject to Tenant's rights under the Apartment Sharing Law and no limits on the number of people who may legally occupy an Apartment of this size.

**2. Failure to give possession** Landlord shall not be liable for failure to give Tenant possession of the Apartment on the beginning date of the Term. Rent shall be payable as of the beginning of the Term unless Landlord is unable to give possession. Rent shall then be payable of the date possession is available. Landlord must give possession within a reasonable time, if not, Tenant may cancel and obtain a refund of money deposited. Landlord will notify Tenant as to the date possession is available. The ending date of the Term will not change.

**3. Rent, added rent** The rent payment for each month must be paid on the first day of that month at Landlord's address. Landlord need not give notice to pay the rent. Rent must be paid in full without deduction. The first month's rent is to be paid when Tenant signs this Lease. Tenant may be required to pay other charges to Landlord under the terms of this Lease. They are called "added rent." This added rent will be billed and is payable as rent, together with the next monthly rent due. If Tenant fails to pay the added rent on time, Landlord shall have the same rights against Tenant as if Tenant failed to pay rent.

**4. Notices** Any bill, statement or notice must be in writing. If to Tenant, it must be delivered or mailed to the Tenant at the Apartment. If to Landlord it must be mailed to Landlord's address. It will be considered delivered on the day mailed or if not mailed, when left at the proper address. A notice must be sent by certified mail. Each party must accept and claim the notice given by the other. Landlord must notify Tenant if Landlord's address is changed.

**5. Security** Tenant has given security to Landlord in the amount stated above. The security has been deposited in the Bank named above and delivery of this Lease is notice of the deposit. If the Bank is not named, Landlord will notify Tenant of the Bank's name and address in which the security is deposited.

If Tenant does not pay rent or added rent on time, Landlord may use the security to pay for rent and added rent then due. If Tenant fails to timely perform any other term in this Lease, Landlord may use the security for payment of money Landlord may spend, or damages Landlord suffers because of Tenant's failure. If the Landlord uses the security Tenant, shall, upon notice from Landlord, send to Landlord an amount equal to the sum used by Landlord. That amount is due, when billed, as rent. At all times Landlord is to have the amount of security stated above.

If Tenant fully performs all terms of this Lease, pays rent on time and leaves the Apartment in good condition on the last day of the Term, then Landlord will return the security being held.

If Landlord sells or leases the Building, Landlord may give the security to the buyer or lessee. In that event Tenant will look only to the buyer or lessee for the return of the security and Landlord will be deemed released. The Landlord may use the security as stated in this section. Landlord may put the security in any place permitted by law, Tenant's security will bear interest only if required by law. Landlord will give Tenant the interest when Landlord is required to return the security to Tenant. Any interest returned to Tenant will be less the sum

Landlord is allowed to keep for expenses. Landlord need not give Tenant interest on the security if Tenant is in default.

**6. Services** Landlord will supply: (a) heat as required by law, (b) hot and cold water for bathroom and kitchen sink, (c) use of elevator, if any, and (d) cooling if central air conditioning is installed. Landlord is not required to install air-conditioning. Stopping or reducing of service(s) will not be reason for Tenant to stop paying rent, to make a money claim or to claim eviction. Tenant may enforce its rights under the warranty of habitability. Damage to the equipment or appliances supplied by Landlord, caused by Tenant's act or neglect, may be repaired by Landlord at Tenant's expense. The repair cost will be added rent.

Tenant must pay for all electric, gas, telephone and other utility services used in the Apartment and arrange for them with the public utility company. Tenant must not use a dishwasher, washing machine, dryer, freezer, heater, ventilator, air cooling equipment or other appliance unless installed by Landlord or with Landlord's written consent. Tenant must not use more electric than the wiring or feeders to the Building can safely carry.

Landlord may stop service of the plumbing, heating, elevator, air cooling or electrical systems, because of accident, emergency, repairs, or changes until the work is complete.

If Landlord wants to change a person operated elevator to an automatic elevator, Landlord may stop service on 10 days' notice. Landlord will then have a reasonable time to begin installation of an automatic type elevator.

**7. Alteration** Tenant must obtain Landlord's prior written consent to install any panelling, flooring, "built in" decorations, partitions, railings, or make alterations or to paint or wallpaper the Apartment. Tenant must not change the plumbing, ventilating, air conditioning, electric or heating systems. If consent is given, the alterations and installations shall become the property of Landlord when completed and paid for. They shall remain with and as part of the Apartment at the end of the Term. Landlord has the right to demand that Tenant remove the alterations and installations before the end of the Term. The demand shall be by notice, given at least 15 days before the end of the Term. Tenant shall comply with the demand at Tenant's own cost. Landlord is not required to do or pay for any work unless stated in this Lease.

If a lien is filed on the Apartment or Building for any reason relating to Tenant's fault, Tenant must immediately pay or bond the amount stated in the Lien. Landlord may pay or bond the lien if Tenant fails to do so within 20 days after Tenant has notice about the Lien. Landlord's costs shall be added rent.

**8. Repairs** Tenant must take good care of the Apartment and all equipment and fixtures in it. Landlord will repair the plumbing, heating and electrical systems. Tenant must, at Tenant's cost, make all repairs and replacements whenever the need results from Tenant's act or neglect. If Tenant fails to make a needed repair or replacement, Landlord may do it. Landlord's reasonable expense will be added rent.

**9. Fire, accident, defects, damage** Tenant must give Landlord prompt notice of fire, accident, damage or dangerous or defective condition. If the Apartment can not be used because of fire or other casualty, Tenant is not required to pay rent for the time the Apartment is unusable. If part of the Apartment can not be used, Tenant must pay rent for the usable part. Landlord shall have the right to decide which part of the Apartment is usable. Landlord need only repair the damaged

*If no broker, insert "None."

part of the Apartment. Landlord is not required to repair or replace any fixtures, furnishings or decorations but only equipment that is originally installed by Landlord. Landlord is not responsible for delays due to settling insurance claims, obtaining estimates, labor and supply problems or any other cause not fully under Landlord's control.

If the apartment can not be used, Landlord has 30 days to decide whether to repair it. Landlord's decision to repair must be given by notice to Tenant within 30 days of the fire or casualty. Landlord shall have a reasonable time to repair. In determining what is a reasonable time, consideration shall be given to any delays in receipt of insurance settlements, labor trouble and causes not within Landlord's control. If Landlord fails to give Tenant notice of its decision within 30 days, Tenant may cancel the lease as of the date of the fire or casualty. The cancellation shall be effective only if it is given before Landlord begins to repair or before Landlord notifies Tenant of its decision to repair. If the fire or other casualty is caused by an act or neglect of Tenant or guest of Tenant all repairs will be made at Tenant's expense and Tenant must pay the full rent with no adjustment. The cost of the repairs will be added rent.

Landlord has the right to demolish, rebuild or renovate the Building if there is substantial damage by fire or other casualty. Even if the Apartment is not damaged, Landlord may cancel this Lease within 30 days after the substantial fire or casualty by giving Tenant notice of Landlord's intention to demolish, rebuild or renovate. The Lease will end 30 days after Landlord's cancellation notice to Tenant. Tenant must deliver the Apartment to Landlord on or before the cancellation date in the notice and pay all rent due to the date of the fire or casualty. If the Lease is cancelled Landlord is not required to repair the Apartment or Building. The cancellation does not release Tenant of liability in connection with the fire or casualty. This Section is intended to replace the terms of New York Real Property Law Section 227.

10. Liability   Landlord is not liable for loss, expense, or damage to any person or property, unless due to Landlord's negligence. Landlord is not liable to Tenant for permitting or refusing entry of anyone into the Building.

Tenant must pay for damages suffered and reasonable expenses of Landlord relating to any claim arising from any act or neglect of Tenant. If an action is brought against Landlord arising from Tenant's act or neglect Tenant shall defend Landlord at Tenant's expense with an attorney of Landlord's choice.

Tenant is responsible for all acts or neglect of Tenant's family, employees, guests or invitees.

11. Entry by Landlord   Landlord may enter the Apartment at reasonable hours to: repair, inspect, exterminate, install or work on master antennas or other systems or equipment and perform other work that Landlord decides is necessary or desirable. At reasonable hours Landlord may show the Apartment to possible buyers, lenders, or tenants of the entire Building or land. At reasonable hours Landlord may show the Apartment to possible or new tenants during the last 4 months of the Term. Entry by Landlord must be on reasonable notice except in emergency.

12. Assignment and sublease   Tenant must not assign all or part of this Lease or sublet all or part of the Apartment or permit any other person to use the Apartment. If Tenant does, Landlord has the right to cancel the Lease as stated in the Tenant's Default section. State law may permit Tenant to sublet under certain conditions. Tenant must get Landlord's written permission each time Tenant wants to assign or sublet. Permission to assign or sublet is good only for that assignment or sublease. Tenant remains bound to the terms of this lease after a assignment or sublet is permitted, even if Landlord accepts money from the assignee or subtenant. The amount accepted will be credited toward money due from Tenant, as Landlord shall determine. The assignee or subtenant does not become Landlord's tenant. Tenant is responsible for acts and neglect of any person in the Apartment.

13. Subordination   This Lease and Tenant's rights, are subject and subordinate to all present and future: (a) leases for the Building or the land on which it stands, (b) mortgages on the leases or the Building or land, (c) agreements securing money paid or to be paid by a lender, and (d) terms, conditions, renewals, changes of any kind and extensions of the mortgages, leases or lender agreements. Tenant must promptly execute any certificate(s) that Landlord requests to show that this Lease is so subject and subordinate. Tenant authorizes Landlord to sign these certificate(s) for Tenant.

14. Condemnation   If all of the Apartment or Building is taken or condemned by a legal authority, the Term, and Tenant's rights shall end as of the date the authority takes title to the Apartment or Building. If any part of the Apartment or Building is taken, Landlord may cancel this Lease on notice to Tenant. The notice shall set a cancellation date not less than 30 days from the date of the notice. If the Lease is cancelled, Tenant must deliver the Apartment to Landlord on the cancellation date together with all rent due to that date. The entire award for any taking belongs to Landlord. Tenant assigns to Landlord any interest Tenant may have to any part of the award. Tenant shall make no claim for the value of the remaining part of the Term.

15. Construction or demolition   Construction or demolition may be performed in or near the Building. Even if it interferes with Tenant's ventilation, view or enjoyment of the Apartment it shall not affect Tenant's obligations in this Lease.

16. Tearing down the building   If the Landlord wants to tear down the entire Building, Landlord shall have the right to end this Lease by giving six (6) months notice to Tenant. If Landlord gives Tenant such notice and such notice was given to every residential tenant in the Building, then the Lease will end and Tenant must leave the Apartment at the end of the 6 month period in the notice.

17. Liability for property left with Landlord's employees   Landlord's employees are not permitted to drive Tenant's cars or care for Tenant's cars or personal property. Tenant must not leave a car or other personal property with any of Landlord's employees. Landlord is not responsible for (a) loss, theft or damage to the property, and (b) injury caused by the property or its use.

18. Playground, pool, parking and recreation areas   If there is a playground, pool, parking or recreation area, Landlord may give Tenant permission to use it, Tenant will use the area at Tenant's own risk and must pay all fees. Landlord charges. Landlord's permission may be cancelled at any time.

19. Terraces and balconies   The Apartment may have a terrace or balcony. The terms of this Lease apply to the terrace or balcony as if part of the Apartment. The Landlord may make special rules for the terrace and balcony. Landlord will notify Tenant of such rules.

Tenant must keep the terrace or balcony clean and free from snow, ice, leaves and garbage and keep all screens and drains in good repair. No cooking is allowed on the terrace or balcony. Tenant may not keep plants, or install a fence or any addition on the terrace or balcony. If Tenant does, Landlord has the right to remove and store them at Tenant's expense.

Tenant is responsible to make all repairs to the terrace or balcony at its sole expense regardless of the cause and whether or not existing prior to Tenant's occupancy. Tenant shall maintain the terrace and balcony in good repair.

20. Tenant's certificate   Upon request by Landlord, Tenant shall sign a certificate stating the following: (1) This Lease is in full force and unchanged (or if changed, how it was changed); and (2) Landlord has fully performed all of the terms of this Lease and Tenant has no claim against Landlord; and (3) Tenant is fully performing all the terms of the Lease and will continue to do so; (4) rent and added rent have been paid to date; and (5) any other reasonable statement required by Landlord. The certificate will be addressed to the party Landlord chooses.

21. Correcting Tenant's defaults   If Tenant fails to timely correct a default after notice from Landlord, Landlord may correct it at Tenant's expense. Landlord's costs to correct the default shall be added rent.

22. Tenant's duty to obey laws and regulations   Tenant must, at Tenant's expense, promptly comply with all laws, orders, rules, requests, and directions, of all governmental authorities, Landlord's insurers, Board of Fire Underwriters, or similar groups. Notices received by Tenant from any authority or group must be promptly delivered to Landlord. Tenant may not do anything which may increase Landlord's insurance premiums. If Tenant does, Tenant must pay the increase in premium as added rent.

23. Tenant's default   A. Landlord must give Tenant written notice of default stating the type of default. The following are defaults and must be cured by Tenant within the time stated:
(1) Failure to pay rent or added rent on time, 3 days.

(2) Failure to move into the Apartment within 15 days after the beginning date of the Term, 10 days.

(3) Issuance of a court order under which the Apartment may be taken by another party, 10 days.

(4) Improper conduct by Tenant annoying other tenants, 10 days.

(5) Failure to comply with any other term or Rule in this Lease, 10 days.

If Tenant fails to cure the default in the time stated, Landlord may cancel the Lease by giving Tenant a cancellation notice. The cancellation notice will state the date the Term will end which may be no less than 10 days after the date of the notice. On the cancellation date in the notice the Term of this Lease shall end. Tenant must leave the Apartment and give Landlord the keys on or before the cancellation date. Tenant continues to be responsible as stated in this Lease. If the default can not be cured in the time stated, Tenant must begin to cure within that time and continue diligently until cured.

B. If Tenant's application for the Apartment contains any material misstatement of fact, Landlord may cancel this Lease. Cancellation shall be by cancellation notice as stated in Section 23.A.

C. If (1) the Lease is cancelled; or (2) rent or added rent is not paid on time; or (3) Tenant vacates the Apartment, Landlord may, in addition to other remedies, take any of the following steps: (a) peacefully enter the Apartment and remove Tenant and any person or property, and (b) use eviction or other lawsuit method to take back the Apartment.

D. If this Lease is cancelled, or Landlord takes back the Apartment, the following takes place:

(1) Rent and added rent for the unexpired Term becomes due and payable.

(2) Landlord may relet the Apartment and anything in it. The reletting may be for any term. Landlord may charge any rent or no rent and give allowances to the new tenant. Tenant may, at Tenant's expense, do any work Landlord reasonably feels needed to put the Apartment in good repair and prepare it for renting. Tenant stays liable and is not released except as provided by law.

(3) Any rent received by Landlord for the re-renting shall be used first to pay Landlord's expenses and second to pay any amounts Tenant owes under this Lease. Landlord's expenses include the costs of getting possession and re-renting the Apartment, including, but not only reasonable legal fees, brokers fees, cleaning and repairing costs, decorating costs and advertising costs.

(4) From time to time Landlord may bring actions for damages. Delay or failure to bring an action shall not be a waiver of Landlord's rights. Tenant is not entitled to any excess of rents collected over the rent paid by Tenant to Landlord under this Lease.

(5) If Landlord relets the Apartment combined with other space an adjustment will be made based on square footage. Money received by Landlord from the next tenant other than the monthly rent, shall not be considered as part of the rent paid to Landlord. Landlord is entitled to all of it.

If Landlord relets the Apartment the fact that all or part of the next tenant's rent is not collected does not affect Tenant's liability. Landlord has no duty to collect the next tenant's rent. Tenant must continue to pay rent, damages, losses and expenses without offset.

E. If Landlord takes possession of the Apartment by Court order, or under the Lease, Tenant has no right to return to the Apartment.

24. Jury trial and counterclaims   Landlord and Tenant agree not to use their right to a Trial by Jury in any action or proceeding brought by either, against the other, for any matter concerning this Lease or the Apartment. This does not include actions for personal injury or property damage. Tenant gives up any right to bring a counterclaim or set-off in any action or proceeding by Landlord against Tenant on any matter directly or indirectly related to this Lease or Apartment.

25. No waiver, illegality   Landlord's acceptance of rent or failure to enforce any term in this Lease is not a waiver of any of Landlord's rights. If a term in this Lease is illegal, the rest of this lease remains in full force.

26. Insolvency   If (1) Tenant assigns property for the benefit of creditors, or (2) a non-bankruptcy trustee or receiver of Tenant or Tenant's property is appointed, Landlord may give Tenant 30 days notice of cancellation of the Term of this Lease. If any of the above is not fully dismissed within the 30 days, the Term shall end as of the date stated in the notice. Tenant must continue to pay rent, damages, losses and expenses without offset. If Tenant files a voluntary petition in bankruptcy or an involuntary petition in bankruptcy is filed against Tenant, Landlord may not terminate this Lease.

27. Rules   Tenant must comply with these Rules. Notice of new Rules will be given to Tenant. Landlord need not enforce Rules against other Tenants. Landlord is not liable to Tenant if another tenant violates these Rules. Tenant receives no rights under these Rules:

(1) The comfort or rights of other Tenants must not be interfered with. This means that annoying sounds, smells and lights are not allowed.

(2) No one is allowed on the roof. Nothing may be placed on or attached to fire escapes, sills, windows or exterior walls of the Apartment or in the hallways or public areas.

(3) Tenant may not operate manual elevators. Smoking is not permitted in elevators. Messengers and trade people must only use service elevators and service entrances. Bicycles are not allowed on passenger elevators.

(4) Tenant must give to Landlord keys to all locks. Doors must be locked at all times. Windows must be locked when Tenant is out.

(5) Apartment floors must be covered by carpets or rugs. No waterbeds allowed in Apartments.

(6) Dogs, cats or other animals or pets are not allowed in the Apartment or Building.

(7) Garbage disposal rules must be followed. Wash lines, vents and plumbing fixtures must be used for their intended purpose.

(8) Laundry machines, if any, are used at Tenant's risk and cost. Instructions must be followed.

(9) Moving furniture, fixtures or equipment must be scheduled with Landlord. Tenant must not send Landlord's employees on personal errands.

(10) Improperly parked cars may be removed without notice at Tenant's cost.

(11) Tenant must not allow the cleaning of the windows or other part of the Apartment or Building from the outside.

(12) Tenant shall conserve energy.

28. Representations, changes in Lease   Tenant has read this Lease. All promises made by the Landlord are in this Lease. There are no others. This Lease may be changed only by an agreement in writing signed by and delivered to each party.

29. Landlord unable to perform   If due to labor trouble, government order, lack of supply, Tenant's act or neglect, or any other cause not fully within Landlord's reasonable control, Landlord is delayed or unable to (a) carry out any of Landlord's promises or agreements, (b) supply any service required to be supplied, (c) make any required repair or change in the Apartment or Building, or (d) supply any equipment or appliances Landlord is required to supply, this Lease shall not be ended or Tenant's obligations affected.

30. End of term   At the end of the Term, Tenant must: leave the Apartment clean and in good condition, subject to ordinary wear and tear; remove all of Tenant's property and all Tenant's installations and decorations; repair all damages to the Apartment and Building caused by moving and restore the Apartment to its condition at the beginning of the Term. If the last day of the Term is on a Saturday, Sunday or State or Federal holiday the Term shall end on the prior business day.

31. Space "as is"   Tenant has inspected the Apartment and Building. Tenant states they are in good order and repair and takes the Apartment as is except for latent defects.

32. Landlord's warranty of habitability   Landlord states that the Apartment and Building are fit for human living and there is no condition dangerous to health, life or safety.

33. Landlord's consent   If Tenant requires Landlord's consent to any act and such consent is not given, Tenant's only right is to ask the Court for a declaratory judgment to force Landlord to give consent. Tenant agrees not to make any claim against Landlord for money or subtract any sum from the rent because such consent was not given.

34. Limit of recovery against Landlord   Tenant is limited to Landlord's interest in the Building for payment of a judgment or other court remedy against Landlord.

**35. Lease binding on** This Lease is binding on Landlord and Tenant and their heirs, distributees, executors, administrators, successors and lawful assigns.

**36. Landlord** Landlord means the owner (Building or Apartment), or the lessee of the Building, or a lender in possession. Landlord's obligations end when Landlord's interest in the (Building or Apartment) is transferred. Any acts Landlord may do may be performed by Landlord's agents or employees.

**37. Paragraph headings** The paragraph headings are for convenience only.

**38. Furnishings** If the Apartment is furnished, the furniture and other furnishings are accepted as is. If an inventory is supplied each party shall have a signed copy. At the end of the Term Tenant shall return the furniture and other furnishings clean and in good order and repair. Tenant is not responsible for ordinary wear and damage by the elements.

**39. Broker** If the name of a Broker appears in the box at the top of the first page of this Lease, Tenant states that this is the only Broker that showed the Apartment to Tenant. If a Broker's name does not appear Tenant states that no agent or broker showed Tenant the Apartment. Tenant will pay Landlord any money Landlord may spend if either statement is incorrect.

**Signatures, effective date** Landlord and Tenant have signed this Lease as of the above date. It is effective when Landlord delivers to Tenant a copy signed by all parties.

LANDLORD: ......................................................

TENANT: ......................................................

WITNESS: ......................................................

**GUARANTY OF PAYMENT**                                          Date of Guaranty _____ 3/4/15 _____

**Guarantor and address**

1. **Reason for guaranty** I know that the Landlord would not rent the Apartment to the Tenant unless I guarantee Tenant's performance. I have also requested the Landlord to enter into the Lease with the Tenant. I have a substantial interest in making sure that the Landlord rents the Premises to the Tenant.

2. **Guaranty** I guaranty the full performance of the Lease by the Tenant. This Guaranty is absolute and without any condition. It includes, but is not limited to, the payment of rent and other money charges.

3. **Changes in Lease have no effect** This Guaranty will not be affected by any change in the Lease, whatsoever. This includes, but is not limited to, any extension of time or renewals. The Guaranty will bind me even if I am not a party to these changes.

4. **Waiver of Notice** I do not have to be informed about any default by Tenant. I waive notice of nonpayment or other default.

5. **Performance** If the Tenant defaults, the Landlord may require me to perform without first demanding that the Tenant perform.

6. **Waiver of Jury trial** I give up my right to trial by Jury in any claim related to the Lease or this Guaranty.

7. **Changes** This Guaranty can be changed only by written agreement signed by all parties to the Lease and this Guaranty.

**Signatures**                                                   GUARANTOR: ......................................................

WITNESS: ......................................................    Guarantor's address: ......................................................

**State of New York, County of** ....................    **ss.:** ACKNOWLEDGMENT RPL209-a (Do not use outside New York State)

On ............................ before me, the undersigned, personally appeared ......................................................

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

......................................................
*(signature and office of individual taking acknowledgment)*

**Riders Related to**
**Standard Form Blumberg Lease Agreement (A55)**
**Entered into on February ___, 2015 (the "Lease") by**
**And between**
**113 BOERUM PL LLC**
**(the "Landlord" or the "Owner")**
**And**
**SHERMAN WRIGHT and KARA WRIGHT**
**(Individually and Jointly, "You" or "Your" or the "Tenant")**
**With respect to**
**113 Boerum Place, Brooklyn, New York 11201, comprising the entire building ("Premises")**
**(the related "Riders")**

1.  In case of any inconsistency between the provisions of the Lease and the provisions of these Riders, such inconsistency shall be resolved in favor of the provisions of those Riders.

    By signing the Lease, you affirm that You have read the Lease and the related Riders and agree to be legally bound by them. All obligations of the Owner and all promises made by the Owner are in this Lease or in these Riders. There are no others. This Lease and the related Riders may be changed only by an agreement in writing signed by and delivered to each party. The term "Lease" where not followed by the words "and the related Riders" shall be interpreted to include the related Riders.

    This Lease is binding on Owner and You, and on Owner's and Your heirs, distributes, executors, administrators, successors and lawful assigns. Owner's obligations end when Owner's interest in the Premises is transferred.

    You represent that You have inspected the premises and have found them to be in good order and repair and are leasing the premises as-is. The sizes of rooms as stated in any marketing material or plans are only approximate in subject to correction, and therefore not to be relied on. The Lease is not effected nor is the Owner liable if the marketing information did not show obstructions or were incorrect in any manner.

    This in a non Rent-Stabilized Lease.

    No landlord-tenant relationship is created until the checks given to the Owner at the time of signing this Lease have cleared and the funds have reached the Owner's bank account. If any such check is dishonored, then You shall have no rights to the Premises.

    You have a duty to obey relevant laws and regulations. You must, at Your expense, promptly comply with all laws, orders, rules, requests, and directions of all governmental authorities and Owner's insurers.

    Notices received by You from any authority or group must be promptly delivered to Owner. Any mail addressed to the Owner but delivered to Your mailbox or to the Premises must also be

Owner's Initials _____          Tenant's Initials _____

Promptly forwarded to Owner at the Owner's current address, and You may seek reimbursement for any actual cost of postage incurred in doing so.

The Owner's acceptance of rent or failure to enforce, or to insist that You comply with, any term in the Lease is not a waiver of any of the Owner's rights. The rights and remedies of Owner are separate and in addition to each other. The choice of one does not prevent Owner from using another.

If any term in the Lease is determined to be illegal or is not enforced or is not enforceable, the rest of the terms of the Lease and the related Riders will nevertheless remain effective in full force.

The Article headlines in these Riders and in the Lease are for convenience only.

The words "we", "us", and "our" in these Riders mean the owner.  The words "you" and "yours" in these Riders mean all Tenants, Sherman & Kara Wright and their respective families. Any use of the word "apartment" in these Riders will be construed to mean "Premises" or "house."

2.    NO LIABILITY: The Owner and its agents, contractors and employees shall not be liable for injury to any person or for property damage sustained by You, any Permitted Occupant of the Premises, Your or any Permitted Occupant's licensees, invitees, guests, pets, contractors and agents or by any other person for any reason. You agree to protect, indemnify and save harmless the Owner and its agents, contractors and employees from all losses, costs or damages suffered by reason of any or other occurrence which causes injury to any person or property and is related in any ways to the use of the Premises.

a.    You will obtain, at Your sole cost and expense, and keep in force during the term of this Lease and the related Riders, comprehensive renter's/homeowner's personal liability insurance insuring You, each Permitted Occupant of the Premises, Your servants, Your employees, people vaulting you, Your or any Permitted Occupant's pets (if any) and the owner. Such insurance will be in standard form and all extended coverages, protecting the Owner (113 Boerum PL LLC, and Malkiel Berlianshik both, individually and jointly) as additional named insured, against any liability whatsoever occasioned by accident or disaster on or about the Premises, including, insofar as the same of such accident or disaster can be attributed to You or any Permitted Occupant of the Premises, or Your or any permitted Occupant's servants or employees, or people visiting You, Your or any Permitted Occupant's pets or any Permitted Occupant. The minimum of personal liability coverage of such insurance shall be two million dollars ($2,000,000.00) per incident and four million dollars ($4,000,000) in aggregate.  Should the underwriter not provide a policy for the aggregate amount, You can be provide this coverage through Your umbrella policy. The minimum coverage of such insurance with respect to loss or damage to the Premises dwelling, including, but not limited to, loss or damage to any fitting, alteration, addition, improvement, and appliance by fire or other casualty shall be two hundred and fifty thousand dollars ($250,000.00).  These various insurance policies must each provide coverage for both units of the Premises.

Owner's Initials _____                          Tenant's Initials _____ _____

b. You will also obtain, at Your sole cost and expense, and keep in force during the term of this Lease and the related Riders, personal property insurance insuring Your furnishings and other items of personal property located on the Premises for full replacement value of all such covered property. Neither the Owner nor any management company managing the affairs of the Owner will be liable or responsible for loss, theft, misappropriation or damage to personal property or injury caused by the property or its use.

c. You will not do anything that may increase the Owner's insurance premiums, but if you do, You must pay the increase in premium as added rent.

d. You shall deliver to the Owner, no later than fourteen days (14) before the begin date of this Lease and the related Riders, a duplicate original of the executed copy of such insurance policies, or a certificate of such insurance policy, as mentioned in paragraph (a) above. In the event You shall fail to deliver to the Owner the duplicate original, or a certificate of such insurance, before the begin date of this Lease and the related Riders, the owner may cause such insurance to be issued and bills for the premiums thereof shall be rendered by owner to You at such times as Owner may elect, and shall be payable by You whom rendered and the amount thereof shall be added rent, due with the next monthly rent.

e. All policies of insurance required pursuant to these related Riders shall be issued by insurance companies that have a minimum rating with regard to its financial strength of at least two of the following: (i) A+ or better by A.M.Best Company, (ii) And or higher by Moody's, and (iii) AA+ or higher by Standard & Poor's or by Fitch, and must be approved by Owner. All such policies shall be issued in the names of Owner and You, and if requested by Owner, Owner's mortgagee as well, and such policies shall be for the mutual and joint benefit and protection of Owner, You and the Owner's mortgagee, as their respective interests may be.

3. LIENS: You shall not permit any mechanics' liens or other liens to be filed against the Property as a result of any material provided to You or work performed by or on behalf of You, or for any reason relating to Your fault. IF a mechanic's lien is filed, You shall, within fifteen (15) calendar days from the date of such filing, cause the lien to be vacated by payment or by filing the requisite bond and shall hold the Owner harmless against the lienor's claim. You shall defend for Your own account of the Owner, at Your expense, any action or proceeding brought to compel payment of the lienor's claim and, in the event of a final judgment in the lienor's favor, shall, without delay, satisfy the judgment and cause a satisfaction to be recorded and the lis pendens, if any, vacated. The Owners may pay or bond the lien if you fail to do so within fifteen (15) days from date of filing. Owner's costs for the same shall be added rent payable by You.

4. HYPOTHECATION, ETC: You shall not encumber, transfer, hypothecate, pledge or mortgage this Lease and the related Riders.

5. LOCKS AND KEYS: You shall not change, alter, remove or modify any locks provided by the Owner. You shall not install additional or replacement locks or security devices apart from those provided by the Owner. If You desire that additional or replacement locks or security devices be installed, You must (i) obtain the Owner's prior written consent, which shall not be unreasonably withheld; (ii) obtain such locks or security devices from a locksmith or company approved by

Owner's Initials _____                    Tenant's Initials _____

Owner; and (iii) bear all costs and expenses associated with such lock or security, keys, combinations or security codes. You shall surrender to the Owner and not keep in You possession any key to the building upon the termination of this Lease and the related Riders.

    a.    You agree that the Owner may provide a spare set of keys to the Premises to the building representative of the Owner for safe keeping for use in any case of future emergency or unforeseen circumstance. Owner agrees to provide the tenant with the contact information for the building representative.

        See also Lease Rider Article 21 with respect to providing keys to the Owner's agent or broker, etc, during the last two months of the term of this Lease.

6.    **ATTORNEY'S FEES, DISBURSEMENTS AND EXPENSES:** You shall agree to pay added rent all reasonable attorney's fees, disbursements and/or other expenses which the Owner may incur or pay out by reason of or in connection with:
    a.    Any Action or proceeding by the Owner to terminate the Lease and the related Riders;
    b.    Any other notion or proceeding by the Owner against You;
    c.    Any default by You in the observance or performance of any obligation under the Lease or the related Riders, whether or not the Owner commenced any action or proceeding against You;
    d.    Any action or proceeding brought by You against the Owner, or any officer, partner, agent or employee of the Owner in which You fail to secure final judgment against the Owner of such officer, partner, agent, or employee of the Owner.

7.    **SECURITY DEPOSIT:** It is understood and agreed that security deposit will not and cannot be used by the tenant for payment of any portion of the final two months' rent. If tenant fully complies with the terms of this lease, the security deposit shall be returned to the tenant within 14 Days from when the Premises is vacated, broom cleaned, inspected by the owner and all keys to said Premises are returned.

8.    **OCCUPANCY AND USE:** No person other than Sherman & Kara Wright and their respective families shall occupy the Premises, and the Premises shall be used only as a private dwelling and for no other purpose. Tenant will not sublet the space in whole or in part to anyone for any length of time. Specifically the tenant shall not allow short-term or long-term occupancy of the premises arranged by and/or leased through the intermediation of airbnb or any similar business. Owner acknowledges that Tenant may have family and family friends visiting and staying at the premises from time to time, this shall not be violation of this provision provided that the premises are not but sublet; advertised for rental; or leased out on transient basis.

9.    **FIRE, ACCIDENTS, DEFECTS, DAMAGES:** You must give Owner prompt notice, within 24 hours of any fire, accident, damage or dangerous or defective condition in the Premises.

10.    **GARBAGE DISPOSAL:** You will sort and dispose of your garbage according to the NYC sanitation department regulations. Garbage should be stored in the garbage cans which will be provided in the front area of the premises in appropriately colored garbage/recycling bags. All cardboard boxes must be broken down and folded before being disposed of, and newspapers and

Owner's Initials _____        Tenant's Initials _____

periodicals must be tied together or securely taped into bundles. Any fine resulting from noncompliance with the above would be Your responsibility and should be paid promptly along with any fees associated with defending Owner and fees for collecting such fine from You.

**The collection schedule for 113 Boerum Place, Brooklyn, New York is:**
**Refuse: To Be Provided**
Place refuse and recyclables at the curb the *night before* collection day.

Should you wish to hire someone twice weekly to prepare the refuse and recyclables and place them curbside, owner can provide recommended service at approximately $75 per month.

11. SNOW REMOVAL: You are responsible for the prompt removal of snow including spreading salt on the sidewalk and on any area of the wood deck, porch and stoop. Any fine issued by New York City resulting from noncompliance with Snow Removal would be Your responsibility and should be paid promptly along with any fees associated with defending Owner and fees for collecting such fine from You.

12. ADDITIONAL RULES: You and each Permitted occupant must comply with the following rules (the "rules"). Notice of new or additional Rules may be given from times to time.

   a. The comfort or rights of neighbors must not be compromised; You are responsible for ensuring no disturbing or annoyingly loud noises, including that of musical instruments or radio or television being played, originate on the Premises.
   b. No awnings, aerial or projections may be attached or erected to the outside walls of the Premises. Clothes, or rugs may not be aired or dried from any window or in the rear yard.
   c. Doors to the Premises must be locked at all times, and windows must be locked when You or any Permitted Occupant is not in the Premises.
   d. Wall to wall carpeting must not be installed.
   e. You are responsible for the cleaning of all windows.
   f. No candle or burning fire may be left burning in the Premises if You or any Permitted Occupant is not in the Premises.
   g. No business is permitted to be carried out from the Premises.
   h. To reduce the likelihood of water damage from tracking in rain / snow / ice You agree to place indoor/outdoor mats at entryways and area rugs in high traffic areas. You agree to avoid rubber-backed rugs or rugs with poor ventilation.
   i. Owner provides remote control devices for a number of appliances throughout the Premises. You agree to maintain the remotes and, if lost, pay for their replacement.
   j. The bathrooms, toilets and wash closets and plumbing fixtures shall only be used for the purpose they were designed and built: sweeping, garbage, bags, acids, or other corrosive substances shall not be placed or poured into them.
   k. IT IS A VIOLATION OF LAW TO REFUSE, INTERFERE WITH INSTALLATION, OR REMOVE WINDOW GUARDS WHERE REQUIRED.
   l. The Premises were originally intended for use as four separate housing units. Owner represents that is has applied for a new Certificate of Occupancy converting the Premises into a one family dwelling.

Owner's Initials _____          Tenant's Initials _____

13.    Landlord agrees to provide the following prior to the commencement of the Lease term.

(a) A front door comparable to the one available at the following web page:

http://www.pella.com/doors/explore-door-styles/entry-door.aspx?type=pella-european-two-panel-entry-door-solid-panel&panelId=17

(b) Tiles on the first floor into the dining room, similar to the rest of the floor area and washer dryer room and bulkhead area next to roof entrance.

(c) Touch up in front bathroom 3rd floor around medicine cabinet.

(d) For the powder room on 2nd floor installation of marble slab for floor and vanity and installation of toilet and faucet.

(e) Installation of window treatments throughout the house.

(f) Installation of glass balcony wall for living room opening to dining room below.

(g) For the master bedroom, installation of acid etched glass panel and door for toilet and bidet rooms.

(h) Installation of calacatta marble for kitchen counter tops.

(i) Installation of all bathroom fixtures.

(j) Installation of energy-efficient LED lightbulbs throughout the house.

(k) A budget for planting of grass, plants or tree in the far left corner of the backyard.

(l) Sconces, a gate and a wooden box for garbage cans to be included in the front of the house.

(m) Desk and wall units to be installed in the front office and to match the color and wood-type of the existing wall unit.

(n) Installation of all appliances including a sub-zero refrigerator and Viking wine cooler.

(o) Kitchen panel on dishwasher.

(p) Kitchen hardware to be purchased from the following web site:
http://www.richelieu.com/us/en/category/decorative-hardware/cabinet-hardware-pulls-knobs/1064512.

(q) Completion is speakers and all low voltage equipment throughout the home.

Owner's Initials _____        Tenant's Initials _____

14.   TERM: These related Riders are co-terminus with the term (length) of the Lease and is governed by clause 2 of the Lease.

15.   INSTALLATIONS: You must obtain Owner's prior written consent to install any paneling, flooring, lighting, "built-in" decorations, partitions, railings, child-guards, plumbing or bathroom fixture and fittings, including washers, driers ad washer-drier combinations, or paint a wall, ceiling, doors, windows, cabinets or wardrobes. If consent is given by Owner, the alterations and installation shall become the property of the Owner when completed and paid for. They shall remain with and as part of the Premises at the end of the term, but the Owner shall retain the right that the Tenant undo and remove the alterations and installations and return the Premises to its original state before the end of the term. The demand shall be by notice, given at least seven (7) days before the end of the term, and you shall comply with the demand at Your own cost. The Owner is not required to do or pay for any work, or any undoing of any consented work.

16.   END OF TERM: At the end of the Term, You must leave the Premises clean and in good condition, subject to ordinary wear and tear, remove all of Your property and all Your installations and decorations, repair all damages to the Premises caused by moving, and restore the Premises to the condition at the beginning of your lease term.

17.   RENT AND LATE PAYMENT OF RENT: Tenant's monthly rent for the Premises for first year of this Lease is $22,000.00 a month for the period from June 1, 2015 until May 31, 2016, prorated for any part month.  Tenant's monthly rent for the Premises for second year of this Lease is $23,000.00 a month for the period from June 1, 2016 until May 31, 2017, prorated for any part month.  In addition, Tenant shall be liable to pay a refundable pet security fee of $1,000.00, and a $500 exit cleaning fee.

Tenant shall be obligated to pay the $22,000.00 rent security, first month's rent of $22,000.00, last month's rent of $23,000.00, pet security fee of $1,000.00 and exit cleaning fee of $500, and broker's fee, upon signing of this lease.

Owner need not give You notice to pay the rent or any added rent. You must pay the Owner the rent, and added rent, if any, in full and without set off or deduction of any kind whatsoever, on or before the 1st calendar day of the month of the month for which the rent is payable, via standing instructions to Your bank for automatic electronic transfer from Your checking account to Owner's checking account which shall be provided prior to the commencement of the lease term.

You must pay rent for the first month to the Owner when you sign the Lease and the related Riders. For subsequent months after the first month of the Lease, if rent is not paid by the tenth (10th) calendar day of the month for which it is owed, You shall additionally pay the Owner an added rent of $500.00, immediately and along with the rent due, but no later than the

Owner's Initials _____                 Tenant's Initials _____

twentieth (20th) calendar day of the month for which the rent is payable. Payment of the rent in monthly installments is for your convenience only.

If you default, Owner may give notice to You that You may no longer pay rent in monthly installments. The entire rent for the remaining part of the term of the Lease will then become immediately due and payable. This Lease and the related Riders and your obligation to pay rent and perform all of the agreements on Your part shall not be affected, impaired or excused, nor shall there by any apportionment or abatement of rent for any reason including, but not limited to, damage to the Premises or any inability to fully use the common areas of the building and premises.

If any construction or demolition work is performed at or near the Premises, it shall not affect Your obligations with respect to this lease and the related Riders even in if such work interferes with Your ventilation, view or enjoyment of the Premises or the common areas of the condominium building and premises.

In the event any rent or added rent amounts due to the Owner under this lease and the related Riders are not paid by the twentieth (20th) of the month, Owner will have the right to unilaterally terminate this Lease and the related Riders at the end of the five (5) days' from the date of a notice is served to You by the Owner or the Owner's agent with respect to such termination of the Lease due to delayed rent, and that You will be required to vacate the Premises.

In the event Tenant shall hold over after the expiration of the Term, the parties hereby agree that Tenant's occupancy of the demised premises after the expiration of the Term shall be upon all of the terms set forth in this lease except Tenant shall pay as rent for the holdover period an amount equal to the higher of (a) two times the sum of (1) the pro rata Fixed Rent payable by Tenant during the last year of the Term and (2) all monthly installments of additional rent payable by Tenant pursuant to the terms of this lease that would have been billable monthly by Owner had the Term not expired; or (b) an amount equal to the then market rental value for the demised premises as shall be established by Owner giving notice to Tenant or Owner's good faith estimate of such market rental value.

18.   NOTICES: Any and all requirements for written notification or notification required under the Lease shall be satisfied by providing notification via electronic mail to each of the email addresses below:

   a.   To the owner, where the Owner is to be the only addressee, at both of the following email addresses:  mberlian@aol.com.

   b.   To You, where You are to be the only addressee at _____
        It shall be the responsibility of each party to immediately inform the other of any change in the above email addresses.

19.   UTILITIES: No utilities are included in the rent- you are responsible for the payment of: one electricity account (ConEd), one gas account (National Grid), telephone, cable television (or

Owner's Initials _____                    Tenant's Initials _____

similar), one security system.  You must get owners approval prior to cancelling any of these listed Utility services. Tenant agrees to pay owner the sum of $ 100.00 per month for water and sewer. Upon receipt of the quarterly water/sewer bills from the City of New York, Owner shall forward the same to the Tenant. If the quarterly bill results in a deficiency, tenant shall reimburse the Owner the difference. In the event there is a surplus the monies shall be applied to following quarter. All water/sewer bills shall be reconciled at termination of the lease.

20.    ROUTINE MAINTENANCE AGREEMENTS: You acknowledge and agree that:

Your Obligations: You will take good care of the Premises and all equipment, appliances, systems and fixtures in the Premises. You will, at Your cost, make all repairs and replacements whenever the need results from Your act or neglect. If You fail to make a needed repair or replacement, Owner may do it and Owner's expenses will be added rent.  You must give Owner prompt notice of required repairs or replacements.

a.    Minor Repairs: For routine maintenance or minor repairs to the Premises including equipment, appliances, systems and fixtures in the Premises, that are not subject to the clause of this Article above, and that need skilled labor, You agree to use owner's services provider with prior written approval of the Owner, and if that Owner agrees to reimburse You, be reimbursed by check or electronic transfer of funds to Your bank account upon the presentation of the invoices. In no circumstances will such reimbursable amounts be offset or deducted from rent or added rent. If you find, contract with, and pay for the services of a plumber/ carpenter/ electrician/ etc on your own, the owner shall have the right to review the work and determine if the same was necessary and if they are required to reimburse the Tenant.

b.    Thermostat: During the months November to March, whether or not You are away from the Premises, You will maintain heat in the Premises at a minimum temperature of 65 degrees Fahrenheit to minimize the risk that water pipes freeze and damage the sprinkler system.

21.    ENTRY TO PREMISES:

The owner has the right, upon reasonable notice unless otherwise proscribed by law, to permit the following people into the Premises: (i) Receiver, trustee, assignee for the benefit of creditors; or (ii) sheriff, marshall or court officer; or (iii) any person from the fire, police, building or sanitation departments or other state, city, or federal government officials.  Owner will have no responsibility for damage or loss as a result of any such person being in the Premises.

22.    OWNER'S ACTION:  Any action the Owner may take or need to take under the Lease or the related Riders will be considered take by the Owner if taken by an agent of the Owner's.

23.    You shall maintain the yard drains located at the property so as to ensure that water does not back up and cause damage to property.

Owner's Initials _____            Tenant's Initials _____

24.    The cellar space is provided for Your convenience and recreational use.  New York City law does
       not permit its usage as a sleeping space.

25.    The Premises is being rented to You "as is".


TO CONFIRM OUR AGREEMENTS, OWNER AND YOU RESPECTIVELY SIGN THESE RELATED RIDERS TO THE
LEASE AS OF THE DAY AND YEAR FIRST WRITTEN ON PAGE 1 OF THE LEASE AND THESE RIDERS

Tenant's Signature: _____    Date: _3/4/15_

Tenant's Signature: _Kara D Wright_    Date: _3/4/15_

Owner's Signature: _____    Date: _____

Owner's Signature: _____    Date: _____

Owner's Initials _____        Tenant's Initials _KDW SW_

**Exhibit "B"**
**Check**





PCH COMMUNICATIONS, LLC
COMMONGROUND / MGS
600 W. Fulton, 4th Floor
Chicago, IL 60661

PAY TO THE
ORDER OF    113 Boerum PL LLC

Sixty eight thousand five hundred and 00/100

113 Boerum PL LLC
100A Broadway, #440
Brooklyn, NY 11249

MEMO

Fifth Third Bank
100 E. Federal Street
Chicago, IL 60661
60-69/750

18836

3/6/2015

$   68,500.00

VOID AFTER 90 DAYS

DOLLARS

AUTHORIZED SIGNATURE

Security Features Included    Details on Back

